Mr. Cassidy, whenever you're ready. Thank you. If the court please, let me be the first to say good afternoon. This case arises from the shooting of plaintiff's decedent, Joe Porter, the early morning hours of November 9, 2009. And the issues presented, your honors, is whether or not the district court sitting in Huntington should have directed a verdict at the end of the evidence with respect to plaintiff's common law negligence claim against the city of Huntington. And also the court's failure to then grant a new trial on said claim. And also the giving of a certain instruction, which we say was inconsistent and confusing by instructing the jury that even if Officer Lusk, who was the person who shot Mr. Porter, had made a mistake, that wasn't unreasonable per se under Section 1983, the Civil Rights Act, and that he still could be found to have acted reasonably. Now, in the early morning hours of November 8, 2009, the Huntington Police Department responded to several shots having been fired at the Club Babylon in downtown Huntington. This was a big club. It stretches pretty much almost a whole block from the front door to the back door, more than 100 feet. I'm not exactly sure it's in the record, but it's long. The shots were from the front. Shots were in the front. The officers rushed in. According to the initial statement that Officer Lusk gave, someone said, never identified, never testified, hearsay, but someone said the shooters are going out the back. Our evidence was just about everyone in that area of the bar was going out the back because people were shooting in front. Evidence is that the police officers rushed towards the back. Our evidence was a number of people were trying to get out of the back at the time. Officer Lusk said he saw Mr. Porter running. It's his first statement. Saw him running, and they went after them, and was running with another gentleman, a Mr. Lamont Miller, that they yelled to stop. Mr. Lamont Miller got down on his knees, and Lusk continued after Porter. Lusk claims that Porter put a gun on him or showed him a gun, and he shot him and killed him. However, deposition time, Officer Lusk said things different from what he said in his statement, including that he spun Mr. Porter around. He had to step to the left in order to get the shot off that he said. He said, ladies, your honors, that he grabbed Mr. Porter from the left. Mr. Porter was right-handed, that he slung him all the way around, and that Mr. Porter had him in his right hand at the time, implying, not that he pulled it on him, implying that Mr. Porter was one of the people who had a gun that night shooting. That was the implication. He denied that he pulled the gun. He had it in his hand when he grabbed it. Now, all the evidence in this case, and the city won't dispute that, was that Mr. Porter, this gun that they recovered, they say they recovered from Mr. Porter, was not used, not shot that night, that Mr. Porter was not involved in this prior shooting. All the forensic evidence, no fingerprints of Mr. Porter on the gun. We did DNA testing. No DNA of Mr. Porter on the gun that the police say he had in his hand at the time he was shot. Two eyewitnesses testified that he did not have a gun in his hand. He had a glass, plastic glass. He was drinking, if anything, at the time. The witnesses, as was Mr. Joe Porter, were young African-American men. The two eyewitnesses were not in any way related by family or friendship to Mr. Joe Porter. The officers, three Caucasian officers, testified all over the lot as to where they first saw this gun. Detective Sperry, who was the detective who was assigned to investigate whether Officer Lusk did anything wrong, testified in his deposition, which we got into at trial, that there was an unidentified gun found at the back, outside the club. It didn't show up in the evidence log. Our case was that the police planted that gun on Joe Porter after they shot him. And from day one, we said maybe it was negligence. Maybe Lusk didn't mean to shoot him. Maybe in the chaos of the situation, he ran in there and saw Joe Porter, who the first officer says, I recognize him as Joe Porter. Evidence was they knew the Porter brothers before this. Rushed in there, and we say he had his gloves on, it was dark, he had a lamp on his gun, and he could have easily squeezed that trigger accidentally. But Lusk testified, though, that he intentionally shot Porter. Yes, he did. He did. So wasn't that the evidence in the case? That shouldn't have been the close of the evidence because there was contradictory evidence. There was genuine issue of material fact because, number one, he didn't know he shot him. What is the evidence that would indicate that he did not intend to shoot him? The evidence is that this was a rush to judgment. The negligence evidence would be that they saw a man fleeing, just like this court's case in the Henry Purnell case, which was 2011, which was after the Webb case, which we rely upon in this case. But in this court, there was a fleeing man that this court found, that a fleeing man who is not presenting a significant risk of harm to the officer is unreasonable. But Henry v. Purnell was a case where there was no dispute that the officer accidentally grabbed his gun instead of his taser. And here you have a different situation. Right, there was a dispute. That's all my point. I'm saying that just the fact... Right, and I've asked you to give us the evidence that would negate Officer Lusk's testimony that he intended to shoot Porter. Well, the testimony was that he didn't know he shot him until after he rolled him over while he was on the floor. Didn't know he shot him or didn't know he hit him? Didn't know he shot him until he rolled him over on the floor. My point is, it was all conflicting as to the gun going off. He wasn't aiming at him. He didn't know he shot him. He knew he shot, but he didn't know he shot him. Yes. He intentionally pulled the trigger on his gun. Yes. So he intentionally shot, but he didn't know whether he hit somebody. All right. At least he said in the beginning, there was a struggle. The evidence was in conflict as to whether or not there was a struggle before he was shot. There was evidence that with respect to where they found the gun, that was all in evidence. The point is, under federal law and the Wess case that we cited, evidence of perjury can be an admission of wrongdoing. Wess says this, it could be an admission of evidence of both negligence and evidence of admission that this person, Mr. Porter, did not have a gun and was unreasonable. In this case, what the court did, by giving an instruction on mistake for the 1983 case, he immunized the officers from a finding of perjury with respect to the 1983 case, and then he inconsistently said, he says because there may have been a mistake, the judge said this because maybe he didn't have a gun. But then when he turns around and rules on our issue of negligence, he says there's no evidence of negligence. He admitted that Webb, he followed Webb as far as we know, which is Judge Berger's district court opinion that we rely so heavily on, which says there's two different duties involved here. And that's because 1983 requires analysis of the moment that force is employed, only, not what comes before, not what comes after. Negligence, Judge Berger said, is something different because you look at the whole circumstances in the beginning and afterwards. And the court said, although we have evidence of mistake, which tends to show negligence, we're going to tell the jury, don't worry, even if he's negligent for purposes of 1983, he's not liable. But we're not going to instruct them on negligence, so you can't use that alternate theory. We think that was wrong. We think that's a case of first impression, by the way, and that is the issue of whether a finding of reasonableness at the moment force is employed is dispositive as a matter of law of a state negligence claim. Because with respect to the force employed, the cases cited by defendant are really dicta. They don't really reach this. They assume it. It is true. The Sigman case versus the town of Chapel Hill and the Pethel case versus West Virginia State Police, those are the two cases cited by defendant that the court did not err in failing to grant a new trial because the jury found against Mr. Porter on a 1983 case. Because at the moment force was employed, the jury said that was reasonable. And so negligence goes out the window. That's not the law. And Sigman versus town of Chapel Hill, that was a domestic dispute where the plaintiff had pulled a knife or had a knife out and there were affidavits from three other witnesses who said he didn't have a knife. And that case went off specifically on whether or not there was sufficient evidence of a material dispute. And Judge Michael gave a very long dissent about he thought the affidavits were enough to create a material genuine issue of dispute. However, in passing the court said, well, since we've disposed of the 1983 claim, we'll dismiss the state claim too. And so we don't know if the state claim was entirely reliant on that very moment. So it was dicta. It wasn't necessary to the holding. The same thing is true with the Pethel case. That was Judge Stamp and our district's decision with respect to where a fugitive fled before sentencing in a criminal matter, took up in the home. There were hostages involved. There was a SWAT team involved. They rammed down the door. And there was safety of others concerned. And the judge, again, in passing said that in order to show negligence under state law, excuse me, in order to show a wrongful death claim, you have to have wrongful conduct, which could include negligence. But a finding of no violation of constitutional law, breach, takes care of that. I think that's incorrect. But it wasn't the main issue. The judge dismissed the claim against the state police in that case based on the allegations with the methodology they used, which is clearly under the immunity statute. You can't challenge the methodology of the SWAT attack and that sort of thing. So it wasn't necessary to the ruling. Mr. Cassidy, your time has expired. Do you want? Okay, you have some time on rebuttal. Oh, okay. Thank you. Mr. Cassidy?  Well, your time has expired. You can come up on rebuttal. Thank you. May it please the Court. My name is Charlie Gould, and I represent the city of Huntington and Officer Luss, the Attalees, in this matter. I think it's important, and Mr. Cassidy touched base on parts of this, that this was tried to a jury, and the jury determined under the 1983 claim that Officer Luss' use of deadly force was objectively reasonable. To that extent, and consistent with the court's decision in Sigmund, that is dispositive of the issue at the time of the shooting. The jury has determined that the officer's conduct was objectively reasonable. What is negligence under West Virginia law? It's an objective standard. How can the officer be objectively reasonable, the jury having found during the moment of force, and yet be unreasonable at the same time for the same conduct? It can't be. And we say that is the law, and it's recognized as such. The only, and I believe, Judge Keenan, you were, I think, touching base on this, the only other claim that we're aware of that could be brought in terms of negligence would be an accidental shooting, perhaps. Officer Luss, in this case, did intend to shoot. He perceived an immediate threat. He said he pushed off, and he intentionally fired at the body mass. Whether or not he knew where he hit him or how he hit him, he didn't know. It was a close combat situation. It was a high-tense situation. We had had, in Huntington, downtown, hundreds of civilians, young kids out at the bar, three people shot, the police responding to this immediate threat. Within 20 seconds, entering the club, to the end of the club, with directions that they're going to the back, the officers perceived two individuals, had probable cause to pursue them, shouted verbal commands, plaintiff's own witness, Mr. Scott, who was in the back of the club, stopped. He heard it. Plaintiff's witness, Mr. Poindexter, stopped. He heard the commands. Mr. Scott in the back of the club thus indicated that Mr. Porter, unfortunately, did not comply with the commands and kept going. And that's set forth in our brief. The officer reached him, spun him, first saw the gun, and fired. Mr. Cassidy brought up the issue of he was wearing gloves. Well, there was no evidence at trial to say that wearing gloves by an officer is a breach of any standard of care or that wearing gloves by an officer approximately caused him to misfire his gun. So we believe the record is clear. There is no evidence of an accidental shooting. What we're looking at in this case is that we agree that under a web analysis, Justice Berger said there could be parallel claims of negligence for actions before or after the shooting, the moment that the jury in this case found that Officer Lust's conduct was objectively reasonable. But, again, there was no evidence of negligent conduct by the officers in this case. They entered the club. They testified how they entered the club. They testified how they had probable cause to believe the two individuals that they saw could have been involved in this shooting, and they had the right to pursue and detain to see if those persons were involved in that activity. In fact, the defense brought an expert, Dr. Streed, who was an expert in police response. He indicated that they had probable cause. I know he's an expert. He had probable cause to pursue these individuals, as did the other officers. And, quite frankly, what they did was textbook. What did the plaintiffs do in response? They didn't ask Dr. Streed one question, nor have they presented to the jury or to the court, what else should the officers have done in this situation? Should they have paused at the beginning, at the start of the club, before they ran in to ask individuals, huh, who are those individuals running to the back? What is the standard of care the officers are supposed to abide by, and how is it breached? Do you understand precisely what the allegation of negligence goes to? Is it that Lusk was mistaken about Porter having a gun, or that Lusk accidentally shot Porter? Under either scenario, the accidental I think we addressed, mistake, that all goes to the moment in time of the shot being fired, and the jury has answered that question. And that goes to the mistake instruction, I believe, which is an accurate instruction under the law. And Judge Chambers got that right. It's an accurate reflection of the law governing 1983 actions. An officer may not be correct. The suspect poses imminent and serious harm. Before deadly force is applied, the officer must reasonably perceive that a suspect poses such a threat. In this case, the plaintiff was presenting evidence that the individual said that he had a glass in his hand. Someone said he had nothing in his hand. The officer saw the gun and they recovered the gun. This is exactly the type of case where that instruction comes into play. And it was a proper instruction. With regard to – does that answer your question? No, but it doesn't matter. Your Honor, I can't recall what else Mr. Cassidy was speaking about today. I think most of the incidents that he was talking about were post-shooting. There was a claim in this case initially for negligent failure to render medical aid. That was directed versus granted on that claim because the officer called EMS and EMS came in. There was also – it's important to note, I believe, that there was a claim in this case that the plaintiff pursued regarding negligent failure to train these officers. Summary judgment was granted on those claims because they couldn't establish that. I think this also goes towards the lack of proof of any negligence. I mean, they just can't plead negligence and say, hey, it was negligent. Where's the standard of care? Where's the breach? They didn't articulate that to the jury. And based upon – we believe that Judge Chambers was right in his decision, but no reasonable jury could have inferred that there was any negligent conduct and reach such a conclusion on this lack of evidence. And with regard to the mistake instruction, if that's where I understand the claimant's error, again, that was a proper instruction under the facts of this case, and it was a proper instruction under all recognized law under 1983 elections. If there are no specific questions, I ask that the court's decisions be upheld and the orders were not erred. Thank you. Thank you. Mr. Cassidy. Judge Keenan, I apologize to you for asking your question. I wasn't quite registering exactly what you were asking in Judge Duncan's question. Counsel, help clarify that. I wasn't thinking as fast. Let me get back to your question, which is what evidence did you have that he was unintentionally shot? That wasn't the argument of our mistake argument. Our mistake argument was going to the question that Judge Duncan raised, that he was mistaken about Joe Porter having a gun in his hand because our evidence was he did not have a gun in his hand. He had a glass in his hand. So the mistake the court was wrestling with was not whether or not it was an intentional shooting. It was whether or not that what display of threat was there at the time. You're saying the negligence was the failure to perceive what was in Joe Porter's hand. Well, that's part of it. It's all the circumstances leading up to it, which Webb says before and after. Let me give you an analogy to the PINA case. The PINA case is the case of the Hispanic neighbor. They're looking for Mr. Gonzalez for not paying child support. They go to Mr. PINA's house. He happens to be Hispanic as well. And they start going around his house, and they cause him to come out the door with his gunshot down. The court said that's not unreasonable. He gets shot. It's a gunshot. The court said that's not unreasonable because, I mean, that is unreasonable to shoot someone just because they have a gun to protect themselves, and he wasn't aiming it. Put a little hypothetical, more hypothetical facts. Excuse me, but I don't think Judge Keenan's question and my question weren't really going to hypothetical facts. What I think we're trying to see, or what I'm trying to see, I'll just speak for myself, here is what are the facts here that Lusk was negligent? And you moved away from having something in his hand other than a gun and back to preceding circumstances. He was negligent in rushing to judgment because he knew this person before. He was an African-American man. We didn't allege that it was his intent. It was race, but he was negligent in assuming this guy was the shooter earlier. He ran up to him. He shot him. He didn't have a gun in his hand. That's negligence, we believe. But that's not – that didn't seem to be what you were arguing, as I understood it, in your brief. No, that is what we argued. He was fleeing. They ran to him. And all these instances in our testimony indicated he was not presenting any threat. But we weren't able to present that as from a negligence standard because the court said that wasn't evidence of negligence. I think it was. If you look at Webb, you can leave it was the response. Webb asked was the response proper before the police even got there as negligence. Just because you have at that very moment what I was trying to get at with the hypothetical, if Mr. Pena had raised the gun at the police at that precise moment, that would have probably been reasonable for the police to shoot him. But you don't ignore what comes before that, what makes a person point a gun if he had done nothing wrong. People are invading his house in the middle of the night. He doesn't know they're the police. You have to consider all that to determine whether there's negligence, not just that very moment. Yes, for 1983 purposes, that's the law, but not for negligence. That's our point. You have to look at all the circumstances. Thank you. Thank you very much. We will ask the courtroom deputy to adjourn court for today, and we will come down and greet counsel. Honorable court stands adjourned until 3 o'clock this afternoon. God save the United States and this honorable court.
judges: Allyson K. Duncan, Barbara Milano Keenan, David C. Norton